# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | |
| | : | Case No. 1:11-CR-63 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING |
| PHILLIP AYERS and | : | DEFENDANTS' MOTIONS TO |
| WESLEY SHOWES, | : | SUPPRESS EVIDENCE |
| | : | |
| Defendants. | : | |

This matter comes before the Court on Defendant Phillip Ayers' Motion to Suppress Evidence (Doc. 22) and Defendant Wesley Showes' Motion to Suppress Evidence (Doc. 23). The Court held a hearing on Defendants' motions on September 15, 2011. For the reasons that follow, the Court **DENIES** Defendants' motions to suppress.

## I. FACTUAL BACKGROUND

The March 18, 2011 arrest of Defendants Ayers and Showes stemmed from a months-long investigation by the Drug Enforcement Administration (DEA) that began in or about November 2010. Several of the officers involved in the investigation and in the arrest, including Cincinnati Police Officers Ken Baker, Josh Schrage, and James Davis, testified during the suppression hearing. At the time of the investigation, Officer Baker had been assigned to the Cincinnati Police Department's DEA task force for approximately seven years and had participated in hundreds of drug investigations. Officer Schrage was at that time and still is assigned to the Cincinnati Police Department's central vice control section mid-level drug unit. He commonly works with the DEA on drug trafficking investigations. Officer Davis also is part

of the central vice control section.  He is the only member of that unit to regularly work in uniform and his primary role in the unit is to support other vice officers by making traffic stops or otherwise assisting when a uniformed officer is needed.

In November 2010, a confidential informant gave information to Officers Baker and Schrage regarding Ayers' and Showes' involvement in heroin trafficking in the Cincinnati, Ohio area.  The informant was incarcerated at the time, and he cooperated with law enforcement in the hopes of receiving leniency with regard to charges pending against him.[1]  However, Officer Schrage indicated the informant had worked with officers in the past and had proven himself to be reliable by providing information that had yielded numerous arrests for drug- and weapon-related offenses.  With regard to this investigation, the informant told the officers that Defendants Ayers and Showes had been supplying him with heroin.  The informant further claimed that Ayers and Showes sold heroin throughout the Cincinnati area and that they obtained that heroin by driving to other source cities, like Dayton and Detroit,[2] to pick up the drugs and transport them back to Cincinnati.[3]

Based on the information from the informant, the officers launched an investigation into Ayers and Showes.  Their investigation initially focused on Ayers, who had a criminal record,

---

[1] The informant had a number of prior convictions.  He was in custody on a pending matter in November 2010, and he remained in custody as of the date of the suppression hearing in this case.

[2] Officer Baker testified that the informant stated that Ayers and Showes traveled to source cities like Dayton and Detroit.  Officer Schrage testified that the informant did not initially specifically identify Detroit as one of the source cities, but rather spoke about trips to source cities in general and Dayton in particular.  Later in the investigation, the informant told the officers that Showes had made a trip to Detroit to purchase heroin.

[3] The informant did not give the officers information about any particular future trips that he expected Ayers and Showes to make.

including a prior conviction in a federal drug conspiracy case, and who was serving a period of supervised release at the time of the investigation.[4]  Ayers' probation officer gave Officer Schrage information about Ayers' residence and other places where he sometimes stayed.  The officers also obtained  a GPS "ping" order, which allowed them to constantly track the location of a cell phone they believed to belong to Ayers.[5]  In addition to tracking Ayers' phone, Officers Baker and Schrage also conducted physical surveillance and monitored phone calls between the informant and Ayers.

While conducting surveillance, the officers observed the following:  In February 2011, Officer Schrage observed Ayers and Showes engage in what appeared to be a hand-to-hand drug transaction at a tire store on West Fork Road, near a neighborhood of Cincinnati known as "Northside."  Ayers and Showes arrived at the tire store in different cars.  Showes remained in his vehicle, and Ayers approached him on foot and gave him a package.

On March 1, 2011, Officer Baker observed Ayers leave his apartment, which was located on Vienna Woods Drive, on the west side of Cincinnati, and drive to Northside, where Ayers pulled into an alley near a barber shop known to be associated with drug trafficking.  Officer Baker then observed another individual approach Ayers' vehicle and hand him a small black satchel.

On March 8, 2011, Officer Baker once again observed Ayers leave his Vienna Woods apartment and drive to a gas station in Northside where someone approached him and gave him a

_____

[4] Showes was also on probation, and he had at least two prior drug convictions from 2001 and 2003.

[5] The officers confirmed that the cell phone belonged to or was generally in the possession of Ayers by observing him on several occasions in the same general location as the cell phone.

McDonald's bag.[6]  Officer Baker described the incident as a quick hand-off.  An individual approached Ayers' vehicle, gave him the bag, and then Ayers drove away.  Ayers was driving a different car than the car he had used on March 1.  At some point, the officers discovered that Ayers worked for a transportation service owned by a family member, giving him access to a number of different vehicles.  When probed further about the circumstances of the March 8 incident, Officer Baker indicated that the hand-off took place in the open, in broad daylight.  He further stated that based on his own experience investigating drug trafficking, he knew that a lot of trafficking is conducted in a similar manner – out in the open, in broad daylight, using common items such as McDonald's bags to conceal drugs or other contraband.  Officer Baker believed that on that occasion, the bag contained money, which he said would have been consistent with information received from the informant regarding Ayers' general practice of distributing heroin to lower level dealers and collecting money at a later date.

There were other times during which the officers tracked Ayers' movement through his cell phone.  For example, the officers had noted at least two occasions, once in late January 2011 and once in early March 2011, when the tracking records showed that either Ayers or someone else carrying his phone made short trips to Detroit, stayed in Detroit for only one or two hours, and then drove back to Cincinnati.  Officer Schrage testified that the tracking records showed similar trips to Dayton, and that on at least one occasion in February 2011, he had followed the cell phone GPS signal to Dayton where he observed a white Cadillac that Ayers was known to

_____

[6] Officer Baker indicated that there was no McDonald's nearby.

drive.[7]  Officer Schrage briefly followed the Cadillac until he feared that Ayers had noticed him. He believed Ayers stayed in Dayton for a few hours that day.

The officers did not obtain a GPS tracking order for Showes' phone because Showes was not the primary target of the investigation and because the officers did not have a reliable cell phone number for him.  Officer Schrage also testified that the accuracy of the GPS tracking sometimes depended on the cell phone service provider, and he feared any attempt to track the number they believed to be associated with Showes would not yield accurate results.  However, the officers did monitor calls that the informant made to Showes while the informant was incarcerated.  During those calls, Showes and the informant spoke in slang about picking up drugs.

On March 18, 2011, the day of Ayers' and Showes' arrests, the officers determined from Ayers' cell phone movement that either Ayers or someone else in possession of the phone was traveling north to Detroit, Michigan.  The officers tipped off DEA officers in Detroit, and directed them to the location of the cell phone.  When the Detroit DEA officers caught up with the cell phone signal, they observed two black males driving around Detroit in a black Lincoln Aviator.  Earlier that day, Officer Schrage had seen Ayers driving around in the same vehicle, and he and Officer Baker believed that the two men observed by the Detroit DEA officers were Ayers and Showes.  The Detroit DEA officers indicated that the Lincoln Aviator stopped in a

_____

[7]  Ayers made other trips during the time period of the investigation, including trips to Indianapolis and to Atlanta, but those trips were longer in duration, leading the officers to believe that those trips were not drug-related.  Officer Schrage testified that the phone records showed that Ayers traveled a lot and that the informant had told him that Ayers liked to go to other cities to "party."  The officers found the trips to Dayton and to Detroit to be suspicious because they were so short in duration, unlike other trips taken by Ayers during the same time period.

high-level drug trafficking area in Detroit.  Consistent with the GPS tracking records of previous trips to Detroit, the two men stayed in town for a brief period before heading back to Cincinnati. Officers Baker and Schrage continued tracking the cell phone's location, and when Ayers and Showes reached the Dayton, Ohio area, Officer Baker started following the Lincoln Aviator as Ayers and Showes made their way toward Cincinnati on I-75.  Officer Baker observed Ayers make a traffic violation,[8] and he instructed Officer Davis, who was in uniform, to conduct a traffic stop of the vehicle.

At approximately 11 p.m., Officer Davis and another uniformed officer, Sean Woods, stopped Ayers and Showes on I-75 about ten miles north of downtown Cincinnati.[9]  When he approached the car, Officer Davis noticed that both Ayers' and Showes' pants were unzipped and that they appeared nervous.  He found the fact that their pants were unzipped to be suspicious given that, in his experience, people often store narcotics in their pants.  Officer Davis told Ayers that he had pulled him over for a traffic stop, and asked both Ayers and Showes for their IDs.  Neither men had warrants under their names.[10]

Officer Davis asked Ayers, who had been driving, to step out of the vehicle first.  He patted Ayers down and did not feel anything abnormal.  He then asked Showes to step out of the vehicle.  When patting Showes down, Officer Davis felt a large bulge in the area of Showes'

---

[8] Officer Davis testified that he was informed that Ayers had changed lanes without using his turn signal.

[9] There were several other officers at the scene.  Officer Schrage arrived at the scene a little while after Ayers was pulled over.  He did not participate in the search of Ayers or Showes.

[10] At some point during the beginning of the stop, Officer Davis asked Ayers to pull up a few feet for safety reasons.  Ayers complied and did not attempt to flee.

groin, possibly in his underwear. Officer Davis testified that it was apparent to him that the bulge was contraband, specifically narcotics.

At that point, fearing the situation may escalate, Officer Davis handcuffed Showes and walked him back over to the police cruiser. Officer Davis then tried to remove the object he had felt during the pat down. Unable to retrieve the object through Showes' underwear, Officer Davis made a small incision in the front of Showes' pants. He then removed from Showes' groin area a bag described as roughly the size of a baseball or softball. The bag contained a large amount of heroin divided into smaller bags.

At the suppression hearing, Defendants showed a video from the traffic stop, on which Officer Davis can be heard asking Showes during the pat down what he has in his pants. Defendants seize upon that question, arguing that it shows that Officer Davis did not in fact know upon plain feel that the package in Showes' pants contained drugs. When asked about that portion of the video on redirect examination, Officer Davis testified that when he feels a suspicious item during a pat down, he often asks the suspect what the item is, even if the nature of the item is immediately apparent. He further explained that in order to avoid a potential conflict, he did not want to reveal to Showes that he believed the item or items concealed in Showes pants were drugs until after he was able to retrieve the drugs.

After seizing the heroin, Officer Davis secured both Showes and Ayers and placed them in the back seats of two different police cruisers.[11] Officer Davis transferred Showes to a Cincinnati Police station, where Showes was questioned by another officer. Ayers was also

---

[11] At some point during the stop, a police canine went over the vehicle. The canine alerted, but no drugs were found in the car.

transferred to a police station and was questioned. After a few hours, Ayers was transported to the Hamilton County Justice Center. While there, officers searched him and found heroin on his person.

Following the arrest of Ayers and Showes, officers obtained search warrants for several locations associated with Ayers. During the searches, officers found two guns and several items commonly associated with narcotics trafficking.

## II.    ANALYSIS

Ayers and Showes filed separate motions to suppress evidence, both of which stem from the circumstances surrounding their arrests on March 18, 2011, which they claim violated their Fourth Amendment rights to be free from unreasonable search and seizure. Showes moves to suppress evidence including but not limited to the heroin found on his person. Ayers moves to suppress evidence including, but not limited to, the heroin found on his person and the firearms seized during the execution of the search warrants associated with Ayers.

Although somewhat unclear from Defendants' motions, both appear to challenge the initial stop of Ayers' vehicle. Following that, Defendant Showes' main argument is that the contents of the bulge in Showes' pants were not immediately apparent to Officer Davis, and as a result Officer Davis went beyond the allowable scope of the pat-down by cutting a hole in Showes' pants to retrieve the drugs. Ayers argues that the fact that heroin was found in Showes' possession did not give the officers probable cause to arrest Ayers. Accordingly, Ayers

maintains the his arrest and the subsequent search of his person and various locations associated

with him were unlawful.[12]

### A.    The Investigatory Stop of Ayers' Vehicle

The Sixth Circuit applies the following framework when analyzing the permissibility of a

traffic stop:

> An ordinary traffic stop by a police officer is a "seizure" within the meaning of
> the Fourth Amendment.  Accordingly, any evidence seized during an illegal
> traffic stop must be suppressed as fruits of the poisonous tree. This circuit has
> developed two separate tests to determine the constitutional validity of vehicle
> stops: an officer must have probable cause to make a stop for a civil infraction,
> and reasonable suspicion of an ongoing crime to make a stop for a criminal
> violation.

*United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (internal citations and quotation marks

omitted).  In this case, both justifications for the stop were present.  At least one officer observed

Ayers switch lanes without signaling, thereby justifying a stop for a civil infraction.

Additionally, the officers had reasonable suspicion that Ayers and Showes had gone to Detroit

for the purpose of picking up heroin to transport back to the Cincinnati area for further

distribution, thereby justifying an investigatory stop under *Terry v. Ohio*, 329 U.S. 1, 30 (1968).

An officer may "stop and briefly detain a person for investigatory purposes if the officer

has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"

*United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 329 U.S. at 30).  The

reasonableness of a *Terry* stop depends on two factors: "(1) whether there was a proper basis for

---

[12] Ayers moves to suppress the evidence found during the searches of various locations associated with him on the ground that the evidence constitutes fruit of the poisonous tree stemming from Ayers' allegedly unlawful arrest.  However, Defendant Ayers maintains that he does not challenge the validity of the search warrant, and the warrant has not been presented to this Court by either Ayers or the Government.

the stop . . . ; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986).

With regard to the first factor, when determining whether an officer had reasonable suspicion to justify the stop, the Court considers the totality of the surrounding circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In this case, as described above, the officers had engaged in a months-long investigation into a tip from a confidential informant who had a proven track record of reliability that Ayers and Showes were involved in transporting heroin into and further distributing that heroin throughout the Cincinnati area. During the investigation, the officers gathered evidence that was consistent with information given to them by the informant. Specifically, the officers discovered that both Ayers and Showes had been convicted of drug-related crimes in the past. The officers observed Ayers on three occasions engage in quick hand-to-hand transactions, the characteristics of which led officers to believe, based on their own training and experience, that the items being handed over were either contraband or proceeds from the distribution of contraband. On at least one of those occasions, Showes was seen receiving a package from Ayers. The officers also learned from the GPS tracking records for Ayers' phone that during the course of the investigation, Ayers made several trips to Dayton and Detroit, during which Ayers did not stay more than a few hours in those cities before returning to Cincinnati. Those trips were consistent with the informant's tip that Ayers' and Showes' *modus operandi* included making short trips to source cities such as Dayton and Detroit to pick up heroin for further distribution in Cincinnati. The officers also monitored phone calls

from the informant to the Defendants, during which, on at least one occasion, Showes discussed picking up drugs.

Finally, on the day of Ayers' and Showes' arrests, Officers Baker and Schrage had been monitoring Defendants movements through both physical surveillance and GPS tracking and had determined the following by the time they instructed Officer Davis to pull Ayers over: (1) Ayers had been seen earlier that day driving around Cincinnati in a black Lincoln Aviator; (2) the GPS records for Ayers' cell phone showed that he had driven to Detroit, which is known to be a source city for heroin, stayed in Detroit for one or two hours, and then had turned around and was headed back to Cincinnati when he was pulled over; and (3) Detroit-area DEA agents, working in cooperation with the Cincinnati officers, had observed two males believed to be Ayers and Showes in the Lincoln Aviator in a high crime area of Detroit. The added factors observed by Officer Davis after he pulled the men over – specifically, that both men appeared nervous and both men's pants were unzipped – only served to increase the level of suspicion during the stop.

Defendants correctly point out that any one of the behaviors or occurrences described above is not by itself proof of illegal conduct. However, as the Supreme Court repeatedly has recognized:

> [There can be] be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity [is] afoot. Indeed, *Terry* itself involved "a series of acts, each of them perhaps innocent" if viewed separately, "but which taken together warranted further investigation." We noted in [*Illinois v. Gates*, 462 U.S. 213, 243-44, n. 13 (1983)], that "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." That principle applies equally well to the reasonable suspicion inquiry.

*Sokolow*, 490 U.S. at 9-10 (internal quotations and citations partially omitted). In this case, the combination of the specific articulable facts known to the officers at the time Ayers and Showes were stopped along with the facts that the men appeared nervous and that both men's pants were unzipped at the time of the stop was at least sufficient to establish reasonable suspicion that Ayers and Showes were engaged in criminal activity. *See Gates*, 462 U.S. at 245-46 (holding that where officers (a) received an anonymous letter stating that the defendants were drug dealers, describing the usual *modus operandi* in which they would travel to Florida to obtain drugs, and providing the date of an expected future trip to Florida, (b) were subsequently able to confirm the defendants' address and details of the future trip such as flight reservations, and (c) observed the defendants engage in behavior consistent with the *modus operandi* described by the anonymous informant, the officers had probable cause to obtain a search warrant for the defendants' house); *United States v. Holloway*, No. 05-80659, 2006 WL 2946788, at *4 (E.D. Mich. Oct. 16, 2006) (holding that an officer had reasonable suspicion to stop the defendants' rental car and conduct a brief *Terry* search of the vehicle where an informant had provided information that: (a) the defendants frequently drove from Detroit to New York in a rental car to purchase heroin, Hertz and other car companies had records of numerous rentals to one of the defendants over the past year, and the cars returned with mileage consistent with that for a trip from Detroit to New York; (b) a GPS tracking device that officers placed on the car the defendant rented tracked the car to New York where it stopped for a period before returning to Detroit, thereby providing support for the informant's statements about the defendant's alleged activities, and (c) upon stopping the defendants, the officer also noticed a discrepancy between the mileage listed on the rental agreement and that of the car, in that the odometer did not

support the defendants' story that they were heading to Chicago or Ohio.); *United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004) (Under totality of circumstances, a police officer had reasonable suspicion to conduct drug dog sniff of the defendant's vehicle at conclusion of traffic stop, where: defendant told officer he drove seven hours to New York City, a known source city for illegal narcotics, and stayed for only a few hours before driving back; the defendant had several air fresheners, commonly used to mask the smell of narcotics, hanging from his rearview mirror; and the defendant was exceptionally nervous and became even more so when the officer raised issue of drug trafficking.). Specifically, the officers had reasonable suspicion to believe that Ayers and Showes had driven to Detroit to pick up heroin and that, at the time of the *Terry* stop, they were in the process of transporting said heroin back to Cincinnati for further distribution.

### B. The Seizure of Heroin Found on Showes

Having concluded that the officers had a reasonable basis to justify the *Terry* stop of Ayers' vehicle, the next question is whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand. In this case, the particular intrusion called into question is Officer Davis' act of cutting a hole in Showes' pants to remove the heroin he had concealed within his underwear. Indeed, it is that act which forms the crux of Showes' motion to suppress.

*Terry* permits law enforcement to conduct a superficial pat down search for weapons during an investigatory stop when there exists reasonable suspicion that the subject may be armed or dangerous. 392 U.S. at 24. In cases such as this one "'[t]he indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer.'"

*United States v. Keith*, No. 08–CR–360, 2010 WL 58988, at *6 (N.D. Ohio Jan. 6, 2010) (quoting *United States v. Garcia*, 459 F.3d 1059, 1065 (10th Cir. 2006)); *see also United States v. Frazier*, 249 F. App'x 396, 403 (6th Cir. 2007) ("[D]rug dealers are often armed."); *United States v. Powell*, No. 99–5137, 2000 WL 357262, at *14 (6th Cir. Mar. 29, 2000) ("[This] frisk was constitutional because [the] suspect was wanted on narcotics charges and [the] officer could reasonably believe that suspect used a gun to protect his drugs."); *United States v. White*, No. 93–4049, 1995 WL 244069, at *10 (6th Cir. Apr. 26, 1995) ("[It is] common knowledge that individuals involved in buying and selling drugs often carry guns . . .."); *cf. United States v. Chavis*, 296 F.3d 450, 458 (6th Cir. 2002) ("[D]rugs and guns are frequently connected.").

A *Terry* search cannot go beyond the bounds needed to conduct a very limited weapons pat-down. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).  However, contraband other than weapons may be lawfully seized without a warrant if, during the *Terry* search, an officer feels an item in the subject's clothing and it is "immediately apparent" to the officer due to the item's content or mass that the item is contraband.  *Id.* at 375-76.  If the officer is unsure of the character of the object, and squeezes or manipulates the object in order to determine its true nature, then the search has exceeded the bounds of a *Terry* pat down and is impermissible.  *Id.* at 378-79.  This principle, often called the "plain feel" doctrine, is an extension of the "plain view" doctrine, which permits the warrantless seizure of an item that has legally come within the plain view of an officer where the officer has probable cause to believe that the item is illegal or otherwise evidence of a crime.  *See id.* at 374-75 (citing *Arizona v. Hicks*, 480 U.S. 321 (1987)). As is true with the plain view doctrine, the requirement under the plain feel doctrine that the incriminating nature of the object be immediately apparent does not equate to a requirement of

absolute certainty that the object is contraband; rather, the plain view doctrine "only requires that the officer have probable cause to believe that the object is contraband by the time he realizes it is not a weapon." *United States v. Jones*, 303 F. Supp. 2d 702, 706 (D. Md. 2004) (citing *Hicks*, 480 U.S. at 327); *see also United States v. Yamba*, 407 F. Supp. 2d 703, 713 (W.D. Pa. 2006) (quoting *Jones* with approval).

In the instant case, the evidence presented at the suppression hearing demonstrated that Officer Davis did not exceed the bounds of a permissible *Terry* search during the pat-down of Showes. As described above, Officer Davis testified that, while frisking Showes, he felt a large round lump, somewhere between the size of an orange and a softball, in Showes' baggy pants under his crotch. Davis further testified that based on the location and size of the bulge, and his experience and knowledge that people often conceal drugs in the groin area, he immediately knew that the bulge contained illegal drugs. Officer Davis gave a credible explanation for why, during the pat-down, he asked Showes what was in his pants – specifically, that he did not want to reveal to Showes that he knew the item was contraband and that it is his general practice upon finding an illegal object during a pat-down to ask the subject of the pat down to identify the object even if its nature is immediately apparent.

The facts of this case are similar to a Sixth Circuit case, *United States v. Walker*, that involved the warrantless seizure of a bag of crack cocaine on the basis of plain feel discovery of the drugs during a pat-down. 181 F.3d 774 (6th Cir. 1999) *certiorari denied by* 528 U.S. 980 (1999). In *Walker*, officers executing a search warrant on a home performed *Terry* searches on everyone present in the house. While conducting a pat-down of the defendant, an officer noticed a bulge in the defendant's pants, which the officer immediately recognized to be a controlled

substance.  *Id*. at 775.  At the time of the search, the officer had six years of experience as a narcotics officer and was aware that illegal drugs are often stored in plastic bags and hidden by drug traffickers underneath their clothing.  *Id*.  After that officer discovered the bulge, another officer pulled the defendant's pants down, and recovered a plastic bag containing crack cocaine. *Id*. at 775-76.  The defendant moved to suppress the drugs, arguing that the officer "felt an object which he knew was not a weapon but thought might be drugs[, and that it was] necessary to pull the defendant-appellant's pants down to uncover the object in order to ascertain that it was indeed drugs."  *Id*. at 777.  The court rejected the defendant's argument, finding that "the seizure of the plastic bag from [the defendant's] buttocks was justified by [the frisking officer's] experience as a narcotics officer and his immediate recognition that the plastic bag hidden on [the defendant's] body contained crack cocaine."  *Id*. at 779.  *See also United States v. McGlown*, 150 F. App'x 462, 467 (6th Cir. 2005) (finding that the district court did not err in determining that an officer permissibly discovered cocaine pursuant to the plain feel doctrine where the court based its finding on the police officer's testimony that he felt something in the defendant's pocket that he recognized as powder cocaine from his training and experience as a narcotics officer); *United States v. Proctor*, 148 F.3d 39, 43 (1st Cir. 1998)  (holding that the seizure of a bag of marijuana from the defendant's jacket fell within the plain feel doctrine where the officer testified that, while patting down the defendant, he felt a plastic bag in the suspect's jacket pocket which, based on his experience and many pat downs conducted during his career, he immediately knew was marijuana); *United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994) (reaching  a similar conclusion where police frisked a man at an airport and felt small, dense

packages taped around his ankles, which the officers, drawing on their training and experience, immediately knew were drugs).

The cases cited by Showes in his defense are distinguishable from both *Walker* and from the facts of the instant case. For example, Showes cites *United States v. Thornton*, in which officers executing a search warrant frisked an occupant of the target dwelling and found cash and cell phones on his person, which were later used as evidence that he was a drug dealer. 493 F. Supp. 2d 1024, 1028 (S.D. Ohio 2007). The district court suppressed the cash and cell phones, finding both that it was not readily apparent that the lumps in the defendant's jacket were a wad of cash and several cell phones and that, even if the identity of the cash and cell phones had been immediately apparent, it was not immediately apparent that the cash and cell phones were evidence of illegal activity. *Id*. at 1034. The *Thornton* court noted that, had the cell phone felt like a weapon, or had its illegality been immediately apparent, the search and seizure would be justified, but the government did not call the searching officer as a witness at the suppression hearing and therefore failed to carry its burden of proof. *Id*. Unlike in *Thornton*, in the instant case, the Government need only establish that it was immediately apparent to Officer Davis that the bulge in Showes' pants was narcotics – once the nature of the narcotics is apparent, the illegality is plain, and seizure of the narcotics is permissible.[13]

---

[13] Showes also relies on *United States v. Garcia*, 496 F.3d 495, 500 (6th Cir. 2007), which involved the seizure of a pager during a pat down. The court in that case found that the seizure did not fall within the plain feel exception to the warrant requirement, noting that "[t]he government did not elicit testimony from the seizing officer claiming that he mistook the pager for a weapon, and even assuming that the officer knew that the concealed object was a pager, it is clear that a pager is not contraband." *Garcia* is more akin to *Thornton* than to the instant case.

Showes cites a number of other cases that are distinguishable on various specific grounds and on the common general ground that in each case, the government failed to put forth credible evidence that the incriminating nature of the item in question was immediately apparent to the officer.[14] *See United States v. Schiavo*, 29 F.3d 6, 9 (1st Cir. 1994) (finding officer exceeded scope of *Terry* frisk by removing and opening a package that was in the front jacket pocket of a suspect, where the officer had repeatedly testified that he did not know what was in the bag when he pulled it out of the defendant's pocket and opened it, although he knew it was not a weapon); *United States v. Shields*, No. 05-20433-B, 2007 WL 4481147, at *8 (W.D. Tenn. Dec. 18, 2007) (finding that the recovery of narcotics from two defendants' pockets did not fall under the plain feel doctrine where the officer's testimony revealed that he had to manipulate the objects in his fingers before determining that there was a high probability that the objects were contraband); *United States v. Mitchell*, 832 F. Supp 1073, 1079 (N.D. Miss. 1993) (concluding that "under the facts of [the] case, an 'immediately apparent' determination of contraband [was not] within the realm of human capability with a single pass of one's hand over the outer clothing" where the contraband in question was cocaine contained in six small plastic bags, which were wrapped in a white athletic sock, which in turn was wrapped in a brown paper bag and was concealed in a lined, interior pocket of a heavy leather jacket); *United States v. Miles*, 247 F.3d 1009, 1014-15 (9th Cir. 2001) (finding that an officer exceeded the scope of a protective pat down by wrapping his hands around and shaking an object, which he eventually determined to be a box of bullets, because there was no evidence the officer thought the box was a weapon and it was not immediately apparent that the box was contraband).

---

[14] In addition to being distinguishable, the cases are not binding on this court.

As discussed above, given Officer Davis' experience and the context in which the *Terry* frisk occurred, the Court finds credible Officer Davis' testimony that he immediately knew that the bulge he felt in Showes' pants was some form of narcotics. On balance, the evidence before the Court demonstrates that Officer Davis did not exceed the bounds of the Fourth Amendment during his pat down of Showes. The Court therefore denies Showes' motion to suppress.

### C.      Lawfulness of Ayers' Arrest

Ayers' motion to suppress is largely based on the premise that he was arrested without probable cause at the scene of the traffic stop. Ayers argues, and the Government does not dispute, that he was arrested at least as of the point when officers transferred him to the police station following the discovery of heroin in Showes' pants. Ayers further argues that his arrest was without probable cause, thereby tainting the subsequent searches of his person and of several residences associated with him. He moves to suppress all evidence discovered during those searches. The Government responds that under the totality of the circumstances, the information known to the officers prior to conducting the *Terry* stop combined with the events that unfolded during the traffic stop established probable cause to arrest Ayers for his participation in trafficking narcotics.

A lawful arrest can be made in public without a warrant as long as the arresting officer has probable cause to believe that the subject has committed, or is committing, a crime. *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). The Sixth Circuit has elaborated on the probable cause standard as follows:

> [T]he Fourth Amendment does not require that a police officer know a crime has occurred at the time the officer arrests or searches a suspect. The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty. The Supreme Court has made clear that there is no precise formula for

determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the factual and practical considerations of everyday life that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur. There is, of course, a requirement that the officers be able to articulate concrete facts from which they infer a probability that illegality has occurred. As we have consistently emphasized, however, while officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt. . . .To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspects illegal conduct. Instead, we need only consider whether there are facts that, given the factual and practical considerations of everyday life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur.

*Id*. at 415-16 (internal citations and quotations omitted).

Defendants do not argue that the officers lacked probable cause to arrest Showes. However, Ayers argues that because the officers did not find any contraband in his vehicle or on his person during the *Terry* stop, they lacked probable cause to arrest him. Ayers cites *Ybarra v. Illinois*, 444 U.S. 85 (1979) for the proposition that for probable cause to be established, a reasonable ground for belief of guilt must be particularized with respect to the person to be seized. *Ybarra* involved a situation in which police officers obtained a warrant to search a tavern and its bartender for evidence of possession of a controlled substance. *Id*. at 88-89. While executing the warrant, the officers conducted pat down searches of all of the customers present in the tavern, including Ybarra. *Id*. at 89. During the pat down of Ybarra, an officer found heroin in Ybarra's pocket. Ybarra challenged the search, and the Supreme Court ultimately held that although the search warrant, issued upon probable cause, gave police officers authority to search the tavern and the bartender for narcotics, the pat down search of the tavern customers and subsequent seizure of heroin from Ybarra was not constitutionally permissible where there

was no reasonable belief that the customers were involved in any criminal activity or that they were armed or dangerous. *Id*. at 90-94. In holding as such, the Supreme Court stated:

> [A] person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

*Id*. at 91 (internal citations omitted and emphasis added).

More than two decades later, in *Maryland v. Pringle*, 540 U.S. 366 (2003), a case more analogous to the instant case, the Supreme Court distinguished *Ybarra* from situations in which there is evidence of a common criminal scheme involving the defendant. In *Pringle*, an officer stopped a car with three occupants for speeding. While talking to the driver, the officer noticed a large amount of rolled-up cash in the open glove compartment. After issuing an oral warning to the driver, the officer asked the driver if he had any if weapons or narcotics in the car. The driver denied having any such items, and then he consented to a search of the car. During the search, the officer seized the money from the glove compartment and found cocaine behind the back-seat arm rest. The officer asked the driver and the two occupants, including Pringle, about ownership of the drugs. When none of the men offered any information about the money or the drugs, the officer arrested all three. *Id*. at 368-69.

Pringle ultimately confessed to ownership of the drugs, but later moved to suppress his confession as the fruit of an illegal arrest, arguing that the officer lacked probable cause to arrest him. *Id*. at 369. Relying on *Ybarra*, Pringle attempted to characterize his arrest as one of guilt by association. The Supreme Court rejected that characterization, finding that it was entirely

reasonable for the officer to infer from these facts before him that "any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." *Id*. at 372. In distinguishing *Ybarra*, the Supreme Court noted the following:

> This case is quite different from *Ybarra*. Pringle and his two companions were in a relatively small automobile, not a public tavern. In *Wyoming v. Houghton*, 526 U.S. 295. . .(1999), we noted that "a car passenger – unlike the unwitting tavern patron in *Ybarra* – will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id*., at 304-305. . .. Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

*Id*. at 373.

Ayers argues that *Pringle* is distinguishable because in that case the drugs were found in the car and possession, ownership, or control of the drugs was not clear, whereas in the instant case, the drugs were clearly in Showes' possession. Were this a case in which officers had simply pulled Ayers and Showes over for a traffic stop, without having any prior knowledge of the men or of their alleged trafficking involvement, the Court might agree that the differences between *Pringle* and the instant case are material. However, in this case, the officers had substantial additional information giving rise to a belief that Ayers was engaged in a common enterprise with Showes. This Court has already discussed in great detail the facts that led up to the *Terry* stop and the observations made by Officer Davis upon approaching Ayers' vehicle. As stated above, those facts at least established reasonable suspicion to justify the *Terry* stop. It would not have taken much more to push the officers' suspicion over the probable cause threshold. The discovery of the heroin on Showes confirmed the officers' suspicion that Ayers and Showes had traveled to Detroit to pick up narcotics for further distribution in the Cincinnati

area.  Under the circumstances of this case, the fact that officers found the heroin on Showes rather than in the vehicle does not lessen the probable cause to arrest Ayers.  Accordingly, the Court finds that Ayers' arrest was constitutionally permissible and denies Ayers' motion to suppress.

**III.    CONCLUSION**

For the reasons stated above, the Court **DENIES** Ayers' and Showes' motions to suppress.

IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court